## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**STEPHEN C. WOODARD,**

       **Plaintiff,**

**v.**                                   **Civil Action No.: 1:14CV223**
                                             **(The Honorable Irene M. Keeley)**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

       **Defendant.**


## REPORT AND RECOMMENDATION/OPINION

Stephen C. Woodard ("Plaintiff") brought this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the defendant, Commissioner of the Social Security Administration ("Defendant," and sometimes "the Commissioner"), denying Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for DIB on August 5, 2011, alleging disability beginning on August 1, 2011. Plaintiff's application was denied at both the initial and reconsideration levels. Plaintiff thereafter requested a hearing, which Administrative Law Judge Theodore P. Kennedy ("ALJ") held on August 15, 2013. Plaintiff, represented by counsel, and Ms. Kathleen Sampeck, an impartial Vocational Expert ("VE"), testified. On September 27, 2013, the ALJ entered a decision finding Plaintiff was not disabled. Plaintiff appealed this decision to the Appeals

Council and, on November 5, 2014, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.

## II. FACTS

### A. Personal History

Plaintiff was born on August 9, 1962, and was fifty-one (51) years old at the time of the administrative hearing (R. 25). He has a high school diploma and can read, write, add, and subtract (R. 26). Plaintiff's prior work experience included working for the United States Postal Service as a letter carrier from 1991 to 2011 (R. 24). Plaintiff's last day of work was July 30, 2011 (R. 26). As of the administrative hearing, Plaintiff is married and resides with his wife and nine-year-old son (R. 25–26).

### B. Medical History Summary

#### 1. Medical History Pre-Dating August 1, 2011

On March 8, 2011, Plaintiff went to the Winchester Medical Center-Emergency Department complaining of back pain (R. 188). Dr. Julie Whitehouse, M.D., subsequently diagnosed him with a herniated disc, ordered an MRI of his spine, and prescribed him the following pain medications: Percocet, Tylox, Roxicet, and Medrol (R. 188–89). Dr. Whitehouse then referred Plaintiff to the Virginia Brain and Spine Center (R. 191).

On March 15, 2011, Plaintiff travelled to Winchester Pulmonary & Internal Medicine for a new patient consultation with Dr. Thomas Murphy, M.D. (R. 217). Complaining of back pain, which radiated onto both sides of his chest, Plaintiff described the pain on a 1–10 scale "as 8/10." Id. Imaging studies revealed Plaintiff had "thoracic vertebral disc disease with anterior cord compression." Id. Dr. Murphy prescribed Plaintiff more Percocet, a pain medication. Dr. Murphy also noted that both Plaintiff's acid reflux and hypertension seemed stable. Id.

The next day, March 16, 2011, Plaintiff went to the Virginia Brain and Spine Center where Dr. Steven Schopick, M.D., examined him (R. 191). Plaintiff indicated his back pain had progressively gotten worse over the last 3–4 months and that the pain now radiates into his hips. Id. In addition, Plaintiff stated his pain medication had not improved his pain symptoms. Id. After examining the MRI, Dr. Schopick concluded that Plaintiff suffered from a "central disc protrusion at T6-7" vertebra (R. 192). Dr. Schopick noted, however, there was "some displacement of the cord, but no abnormal cord signal or cord compression." Id. Other tests revealed normal gait, posture, strength, muscle tone, and intact cranial nerves. Id. Straight leg raising tests were also negative. Id. Dr. Schopick referred Plaintiff for physical therapy. Id.

Plaintiff returned to the Virginia Brain and Spine Center in April 2011 (R. 194–200). On April 5th, Plaintiff reported pain being "8/10" around his chest, back, and hips (R. 194). He described it as "constant, stabbing, and shooting." Id. Plaintiff also noted that physical therapy and his medication were not helping. Id. On April 19th, Plaintiff indicated to Dr. Michael Poss, M.D., that his pain was a "7/10" (R. 199). Dr. Poss then proceeded to give Plaintiff an epidural injection in his back. Id.

On May 9, 2011, Plaintiff presented to Dr. Michael Hasz, M.D., at the Virginia Spine Institute for a new patient consultation (R. 264–66). Plaintiff reported his back pain as an "8/10" (R. 264). Upon examination, Plaintiff's neck and spine showed no scarring; the T4–T8 vertebrae were tender to palpations; normal straight leg raises; motor reflexes were 5/5; ankle and knee reflexes were 2/4; and normal sensations to touch (R. 265).

Plaintiff reported back to the Virginia Spine Institute on May 17th to meet with Dr. Thomas Nguyen, M.D. (R. 262–63). Dr. Nguyen administered another epidural injection in Plaintiff's back (R. 263).

Plaintiff reported back to Dr. Hasz on June 10th for a recheck (R. 283–84). Plaintiff indicated "noticeable good relief" of thoracic pain after the latest injection, but still had ongoing low back pain (R. 283). Dr. Hasz noted 5/5 motor strength testing in lower extremities; 2/4 deep tendon reflexes in ankles and knees; negative straight leg raise; and normal sensation to touch. Id. Dr. Hasz recommended more physical therapy and having another MRI taken. Id.

Plaintiff returned to Dr. Hasz on June 27th for a follow-up appointment (R. 278–79). Plaintiff reported thoracic pain and low back pain as a "6 out of 10 on the pain scale" (R. 278). Plaintiff stated that the injection helped for approximately four weeks before the pain started to return. Id. Dr. Hasz noted that Plaintiff had tenderness over the T8/9 and T9/10 facet joints; increased pain on extension; 5/5 lower extremity muscle strength; and 2+/4 patellar and Achilles reflexes. Id. Dr. Hasz recommended another epidural injection, which was administered on July 13th and the 27th (R. 258–59, 260–61, 279).

On July 25, 2011, Plaintiff returned to Winchester Pulmonary & Internal Medicine for a follow-up appointment with Dr. Murphy (R. 215). Plaintiff indicated that he still has persistent back pain and that his blood pressure has been elevating. Id. Dr. Murphy therefore increased Plaintiff's blood pressure medication. Id. Dr. Murphy also noted that Plaintiff's physical exam revealed "no acute distress" and that his acid reflux seemed stable. Id.

*2. Medical History Post-Dating August 1, 2011*

On August 22, 2011, Plaintiff reported to Dr. Hasz for another follow-up appointment on his ongoing thoracic and low back pain (R. 273–74). Plaintiff indicated that the thoracic facet injections were "not at all helpful" and that the thoracic epidural injections provided only a few days of relief. Id. Dr. Hasz noted that Plaintiff exhibited tenderness to palpations over the

thoracic spinous process; non-tender over the SI joints; 5/5 lower extremity muscle strength; and 2+/4 patellar and Achilles reflexes. Id.

The same day, August 22nd, Plaintiff also met with Dr. Nguyen for a pain management consultation (R. 254–56). Plaintiff reported worsening symptoms in his back and arms (R. 254). Dr. Nguyen noted tenderness over the T6 and T7 spinous process. Id. In addition, Plaintiff exhibited 60 degree thoracic flexion; 70 degree lumbar flexion with pain; 2/4 Achilles reflex; 2/4 patellar reflex; and 5/5 motor strength (R. 254–55). Dr. Nguyen recommended to Plaintiff a TENS unit and Duragesic patch (R. 255).

On September 26, 2011, Plaintiff returned to Dr. Hasz for a follow-up (R. 269–70). Plaintiff reported less pain, a "4 out of 10" on the pain scale, which he attributed to the pain patch and not working at the Postal Service anymore (R. 269). Plaintiff also reported that the current medication regimen better controlled his pain. Id. Upon examining Plaintiff, Dr. Hasz noted tenderness over the SI joints; positive straight leg raise; 5/5 lower extremity muscle strength; decreased cervical rotation bilaterally to 70 degrees with no pain; and normal rotation of the hips. Id.

On October 17, 2011, Plaintiff reported to Dr. Nguyen for another pain management appointment (R. 251–52). Plaintiff indicated improved pain levels due to the medication, but added that the Duragesic patch only provided relief for approximately two days (R. 251). Plaintiff reported a "6 over 10" on the pain scale." Id. Dr. Nguyen also noted tenderness and lumbar flexion with pain. Id.

Plaintiff went back to Dr. Nguyen on December 12th for an evaluation of his medications (R. 345–47). Plaintiff reported that the medications and patches were no longer effective (R. 345). He also reported that his thoracic pain had "gotten better" but his lumbar pain had not. Id.

Dr. Nguyen noted tenderness over the paraspinal muscles; nonantalgic gait; lumbar flexion at 70 degrees with pain; positive straight leg raises; 2/4 Achilles reflex; and 5/5 motor strength. Id.

On December 14, 2011, Plaintiff met with Dr. William Brink, M.D. (R. 329–32). Plaintiff reported sleeping better and feeling "okay" (R. 329). Upon examining the Plaintiff, Dr. Brink noted that Plaintiff was in no distress, exhibited normal bodily system, and that his hypertension and GERD were stable (R. 330–31). In addition, Dr. Brink, regarding Plaintiff's disc herniation, stated that Plaintiff's "pain certainly seems out of proportion" opining that it was "a function of [Plaintiff's] presumably low pain threshold" (R. 331).

On December 23, 2011, Plaintiff reported to Dr. Neil Chatterjee, M.D., for an electroneuromyographic evaluation (R. 340–44). Plaintiff indicated a "6/10" on the pain scale and described his pain as "aching" (R. 341). Following the electrodiagnosic exam, results were normal with no evidence of lumbar radiculopathy or generalized peripheral neuropathy (R. 340). In addition, Plaintiff had 5/5 strength in motor testing, intact sensation, 2+ deep tendon reflexes, and intact pulses (R. 341).

Plaintiff returned to Dr. Nguyen on January 31, 2012, for a follow-up appointment (R. 405–07). Plaintiff reported that his pain was "stable" and "under fair-good control with the current [medication] regimen" (R. 405). Plaintiff also reported a "6 over 10" on the pain scale. Id. Dr. Nguyen noted that Plaintiff's mood and affect were appropriate; lumbar flexion was 70 degrees with pain; straight leg raises caused pain; 2/4 Achilles reflex; 5/5 motor strength; and tenderness over the paraspinal muscles. Id.

Plaintiff reported back to Dr. Brink on April 25, 2012, for a follow-up (R. 457–59). Plaintiff indicated to Dr. Brink that he had continued pain in his hips, legs, knees, and back (R.

457). Following the exam, Dr. Brink noted that Plaintiff's hypertension and hypercholesterolemia were stable; and that Plaintiff appeared to be in no distress (R. 458–59).

On May 3, 2012, Plaintiff had another follow-up with Dr. Nguyen (R. 402–04). Again, Plaintiff reported stable pain levels that were under fair-good control (R. 402). Describing the pain as a 6/10, Plaintiff complained of ongoing back pain and knee pain. Id. Furthermore, Plaintiff stated that he now ambulates with a straight cane. Id. Upon examination, Dr. Nguyen noted that Plaintiff's mood and affect were appropriate; non-antalgic gait; tenderness over paraspinal muscles; lumbar flexion at 70 degrees with pain; 2/4 Achilles reflex; 5/5 motor strength; and pain causing straight leg raises (R. 402–03).

Due to his ongoing knee pain, Plaintiff met with Dr. Richard Patterson, M.D., on May, 4, 2012 (R. 379). Dr. Patterson's examination revealed no effusion in the knee, no locking, no particular medial and lateral joint line pain; well-maintained joint spaces; and no abnormalities. Id. Dr. Patterson prescribed pain medication and home exercises for Plaintiff to do. Id.

Six weeks later, June 22, 2012, Plaintiff returned to Dr. Patterson for a follow-up (R. 378). Plaintiff reported while he was not back to 100%, he "has been pretty good, but not perfect without his daily exercises." Id. Upon physical examination, Plaintiff's knee revealed no effusion and less tenderness. Id. Plaintiff did present a new problem: a left trigger thumb. Id.

A month later, July 26, 2012, Plaintiff had a follow-up with Dr. Nguyen (R. 399–401). Plaintiff reported his pain as 6/10, but that it was stable and under control with the current medication (R. 399). Plaintiff also reported that his knee pain was much more manageable. Id. Following examination, Dr. Nguyen noted that results were unchanged from the last exam except that Plaintiff's lumbar flexion decreased to 50 degrees (R. 400).

On September 4, 2012, Plaintiff met with Dr. Brink for a follow-up appointment (R. 454–56). Dr. Brink noted that Plaintiff exhibited all normal bodily systems (R. 454). In addition, Dr. Brink stated that because Plaintiff's hypertension had been stable he would begin to taper off Plaintiff's medication (R. 456). Furthermore, Dr. Brink also noted that Plaintiff's GERD and Generalized Anxiety Disorder were all stable. Id.

A few weeks later, September 18, 2012, Plaintiff returned to Dr. Patterson for his left trigger thumb pain (R. 440). Although injections previously done in the thumb had helped, Plaintiff stated that the pain had returned. Id. Dr. Patterson recommended that they proceed with a trigger thumb release to be scheduled in the near future. Id.

The next day, September 19, 2012, Plaintiff had a follow-up with Dr. Nguyen (R. 396–98). Again, Plaintiff noted stable pain levels under the medication with a 6/10 on the pain scale (R. 396). Plaintiff also complained of shortness of breath although a chest x-ray revealed nothing. Id. Plaintiff noted he still continues to use the cane for ambulation. Id. Plaintiff's examination findings remained unchanged from the last appointment (R. 397).

On October 2, 2012, Plaintiff returned to Dr. Patterson regarding his trigger thumb (R. 439). Following a procedure, both the triggering and snapping on his thumb ceased. Id. Plaintiff also reported having no pain. Id. Dr. Patterson removed the sutures and noted no evidence of infection. Id. Dr. Patterson recommended certain exercises for Plaintiff to work on to help increase flexion. Id.

Two months later, December 12, 2012, Plaintiff returned to Dr. Nguyen for a follow-up (R. 393–95). Plaintiff reported his pain as a 6/10, but also noted that it "has gradually worsened over the last several months" (R. 393). Plaintiff furthermore stated that for the past two months he has suffered thoracolumbar discomfort, which he described as "dull and achy." Id. He also

still uses the cane to ambulate. Id. Plaintiff's physical exam remained unchanged from last appointment (R. 394).

In early January 2013, Plaintiff had another follow-up with Dr. Nguyen (R. 390–92). Plaintiff reported his pain "is well controlled on the current regimen of medications and is improved with the recent change in medications" (R. 390). Plaintiff indicated a 4/10 on the pain scale. Id. All other examinations of Plaintiff remained unchanged from last visit (R. 391–92).

Two months later, March 7, 2013, Plaintiff met with Dr. Nguyen for another follow-up (R. 429–31). Plaintiff reported that he heard a "pop" in his back and suffered an "exacerbation of low back pain after bending over two weeks ago" (R. 429). Plaintiff described his current pain between 4/10 and 6/10 on the pain scale and described it as "dull, achy, and throbbing." Id. Following a physical examination, Dr. Nguyen noted that Plaintiff still had a 50 degree lumbar flexion; 2/4 Achilles reflex; and 5/5 motor strength (R. 429–30).

One week later, March 13, 2013, Plaintiff had a follow-up appointment with Dr. Brink (R. 449–52). Plaintiff reported "frequent nocturia," as well as a loss of libido (R. 449). Due to Plaintiff's blood pressure medicine being tapered off, Plaintiff's blood pressure showed diastolic readings in the 90s. Id. After examining the Plaintiff, Dr. Brink noted that he exhibited all normal bodily systems (R. 449–50). To combat his rising blood pressure, Dr. Brink prescribed Plaintiff a low dose of Toprol (R. 451).

On May 31, 2013, Plaintiff returned for a follow-up with Dr. Nguyen (R. 426–28). Plaintiff reported that his pain was stable and "back to baseline after his fall a couple months ago" (R. 426). He reported no new injury or weakness, but that his pain was still a 6/10 on the pain scale. Id. Physical examination remained the same, except that Plaintiff gait was antalgic (R. 427).

In July 2013, Plaintiff had a follow-up with Dr. Brink (R. 465–67). Plaintiff reported no improvement in his energy level or libido; he did note that his anxiety levels were stable (R. 465). Both Plaintiff's hypertension and GERD readings were stable as well (R. 466).

One month later, August 29, 2013, Plaintiff returned to Dr. Nguyen for a follow-up (R. 471–74). Plaintiff reported that his pain "is poorly controlled on current regiment of medications," and that it was still a 6/10 on the pain scale (R. 471). Plaintiff reported "increasing low back pain with intermittent radiation down the back of the legs to the knees." Id. Physical examination remained unchanged from last appointment (R. 471–72).

On September 3, 2013, Plaintiff met with Dr. Nguyen again (R. 480–81). Plaintiff still reported that the medication was poorly controlling his pain (R. 480). He then elected to proceed with bilateral injections in his back, which were done that day. Id. All other physical examination findings remained unchanged from last appointment. Id. Plaintiff's MRI done on September 1, 2013 revealed a smaller disc protrusion at T6–T7 vertebrae and no new disc herniation or spinal stenosis (R. 478–79).

### 3. Medical Reports/Opinions

On September 23, 2011, state agency medical consultant Dr. Rabah Boukhemis, M.D., completed a physical residual functional capacity ("RFC") assessment of Plaintiff (R. 222–29). Dr. Boukhemis found that, while Plaintiff possessed no manipulative, visual or communicative limitations, Plaintiff did possess exertional, postural, and environmental limitations. Regarding Plaintiff's exertional limitations, Dr. Boukhemis found Plaintiff able to: (1) occasionally lift and/or carry twenty pounds; (2) frequently lift and/or carry ten pounds; (3) stand and/or walk for approximately six hours in an eight-hour workday; (4) sit for approximately six hours in an eight-hour workday; and (5) push and/or pull with no limitations (R. 223). Turning to Plaintiff's

postural limitations, Dr. Boukhemis noted that Plaintiff can frequently balance, stoop, and kneel; however, Plaintiff can occasionally only crouch, crawl and climb ramps, stairs, ladders, ropes, and scaffolds (R. 244). Finally, concerning Plaintiff's environmental limitations, Dr. Boukhemis stated that Plaintiff must avoid concentrated exposure to: extreme cold, wetness, humidity, vibration, fumes, odors, dusts, gases, poor ventilation and hazards such as machinery and heights (R. 226). Dr. Boukhemis, however, did note that Plaintiff need not avoid exposure to extreme heat or noise. Id.

During the physical RFC assessment, Plaintiff alleged that he suffered from "back problems, depression, anxiety, high blood pressure, high cholesterol, acid reflux disease, degenerative disc disease, and numbness in leg and feet" (R. 229). Despite these complaints, Plaintiff nonetheless reported that he is able to perform his own personal care, wash laundry, cook, dust, and drive a car (R. 227). Dr. Boukhemis found Plaintiff to be "partially credible" (R. 229).

On November 22, 2011, state agency medical consultant Dr. Pedro Lo, M.D., likewise completed a physical RFC assessment of Plaintiff (R. 311–18). Dr. Lo concurred with Dr. Boukhemis's assessment of Plaintiff regarding his exertional, manipulative, visual, and environmental limitations (R. 312, 314–15). Dr. Lo did reach a different conclusion on Plaintiff's postural limitations. Dr. Lo found that Plaintiff could occasionally crawl, crouch, kneel, stoop, balance, and climb ramps and stairs (R. 313). Plaintiff could not, however, climb ladders, ropes, or scaffolds. Id. Dr. Lo also found Plaintiff to be "mostly credible" and classified his RFC as "light" (R. 318).

On February 7, 2012, licensed psychologist Dr. Harry Hood, M.S., completed a mental status examination of Plaintiff (R. 349–53). Plaintiff reported having anxiety symptoms coupled

with depression, low energy, sleep problems, panic attacks, worthlessness, shaking, diarrhea, nausea, sweating, shortness of breath, and heart palpitations (R. 350). In his report, Dr. Hood opined that Plaintiff had a depressed mood and restricted affect (R. 351). Dr. Hood thus concluded that Plaintiff had generalized anxiety disorder with panic and also depressive disorder (R. 352). Dr. Hood further opined that Plaintiff had a poor prognosis. Id.

Three days later, February 10, 2012, Dr. Jeff Boggess, PhD, completed a psychiatric review of Plaintiff (R. 354–66). In his report, Dr. Boggess noted that Plaintiff's affective disorders and anxiety-related disorders were "not severe" (R. 354). Dr. Boggess also opined that Plaintiff had a mild degree of limitation in daily living, social functioning, and maintaining concentration, persistence or pace (R. 364). Dr. Boggess also noted that Plaintiff had no episodes of decompensation. Id.

On October 16, 2012, Dr. Nguyen completed a statement of disability of Plaintiff (R. 380–81). In his report, Dr. Nguyen concluded that Plaintiff was "totally disabled" because of physical impairment caused by thoracic disc herniation and thoracic pain (R. 380). Plaintiff, however, exhibited no cardiac limitation and had mild mental impairment (R. 381). Dr. Nguyen also noted that "chronic pain limits all of [Plaintiff's] activities" and needs opiates medication to manage the pain (R. 380–81).

Six weeks after the ALJ released his decision, Dr. Nguyen on November 5, 2013, completed a medical assessment of Plaintiff's ability to do work-related activities (R. 482–85). Dr. Nguyen opined that Plaintiff can (1) occasionally lift and/or carry 25 pounds; (2) frequently lift and/or carry 15 pounds; (3) stand/walk between four and six hours in an eight-hour workday; and (4) sit six hours in an eight-hour workday (R. 482–83). Regarding Plaintiff's postural activities, Dr. Nguyen stated that Plaintiff could frequently balance but only occasionally climb,

stoop, crouch, kneel, and crawl (R. 483). Concerning environmental restrictions, Dr. Nguyen indicated that Plaintiff had restrictions regarding heights, extreme temperatures, and vibrations. Id. Finally, Dr. Nguyen noted that Plaintiff was limited to occasional reaching and handling but had no visual or communicative limitations (R. 484–85).

### C. Testimonial Evidence

At the administrative hearing held on August 15, 2013, Plaintiff divulged his relevant personal and work related facts. At the time of the hearing, he was fifty-one (51) years old, married, and lives with his wife and nine-year-old son (R. 25–26). He has a high school diploma and has never taken any college level courses. Id. Plaintiff's employment history includes work as a letter carrier for the U.S. Postal Service (R. 24). Plaintiff last worked July 30, 2011 (R. 26). Since August 1, 2011, Plaintiff has not filed for any types of unemployment benefits. Id. While working, Plaintiff did file one worker's compensation claim after receiving a dog bite to his left leg; he testified it does not give him any trouble (R. 27–28). In 2012, Plaintiff received a cane from Dr. Nguyen and uses it about 100% of the time although Plaintiff later stated he could stand without the cane's assistance (R. 28).

Regarding his medical condition, Plaintiff claimed he has degenerative disc disease of the spine and chronic back pain syndrome (R. 29). Yet, he has never had any surgery on his back. Id. He has, however, had other surgeries: two hernia operations, a cyst removed from his tailbone, and, recently, thumb surgery to his left hand. Id. Plaintiff stated he is in "constant pain" radiating from his lower back, hips, and shoulder blades. Id. The pain from his shoulder blades is caused by three herniated discs and subsequently causes Plaintiff to suffer neck pain and headaches at least five times a week (R. 29–30). Despite this pain, Plaintiff has never had any diagnosis to his hip or ball joints (R. 30). Plaintiff testified that the doctors told him that the pain

originates from his back. Id. On a 0–10 pain scale, with 10 being the highest, Plaintiff stated that his back pain on a typical day is 7–8 even after taking his medication (R. 31). Plaintiff testified he takes the following medications: morphine, Prevacid, Zocor, Toporol, Cymbalta, Xanax, Celebrax, MS Contin, MSIR, and Androgel. Id. If he does not take his medication, he gets the "shakes," but functions normally when on the medicine (R. 33). Plaintiff testified that the Xanax is for his nerves and anxiety. Id. In addition, the medicine makes him very drowsy (R. 38).

Discussing his physical limitations, Plaintiff stated he can sit for half an hour before he has to stand up and walk (R. 31). He also stated he can only stand for half an hour before having to sit down or walk. Id. When walking, he noted that he can only usually walk a block before having to take a break (R. 32). He cannot walk a block without his cane either. Id. Although Dr. Nguyen and Dr. Hoss instructed him to not do any lifting, Plaintiff testified that he can lift at the most five pounds. Id. Yet, Plaintiff later stated that he could lift a twenty pound sack of potatoes if he had too. Id. In addition, he has no reported problems with his hands (R. 33).

Lifestyle wise, Plaintiff reported never losing a job or never having any issues due to substance abuse (R. 33–34). In addition, Plaintiff testified he has friends, can get along with anyone, and can follow verbal directions. Id. During the day, he spends very little time, about ten minutes, on the computer (R. 35). He watches television and has a cell phone. Id. Plaintiff can also dress and bathe himself without assistance. Id. Regarding chores around the house, Plaintiff stated that he can take the garbage out, even if it was over five pounds (R. 36). He next testified that he cannot cook, vacuum, or perform any yard work due to his back pain. Id. He can, however, wash and load the dishwasher and do laundry as long as someone carried the clothes to the washroom for him (R. 36–37). Although he has a driver's license, Plaintiff does not drive and has not driven since being prescribed morphine—Plaintiff fears being pulled over by the police

and being arrest for DUI for driving on his medication (R. 37). Plaintiff testified it has at least been over a year since he last drove (R. 38). This concluded the ALJ's questioning of Plaintiff. Id.

When questioned by his attorney, Plaintiff elaborated on his day-to-day pain. About his headache pain, Plaintiff stated that he gets one headache at least every other day (R. 39). His headache is centered "right in the back of [his] head" and will last about half the day." Id. To relieve himself of this pain, Plaintiff takes ibuprofen in addition to the morphine. Id. Plaintiff also testified that he has knee pain as well (R. 40). Plaintiff described this pain as like "a toothache"; he blames all the walking he did as a letter carrier as the primary contributor to this pain. Id. Plaintiff stated that he has arthritis in his knees. Id. To relieve the pain, besides the medicine, Plaintiff stated he uses electric currents and props his feet up while on the recliner. (R. 40–41). Regarding his sleeping pattern, Plaintiff testified that he usually gets four to five hours a night due to the pain and that he can only sleep flat on his back (R. 41). The major side effect of his medication Plaintiff complained about is how drowsy it makes him feel. Id. It makes him nap during the day for usually two hours (R. 42). This concluded Plaintiff's testimony.

Before moving onto the vocational expert's testimony, the ALJ told Plaintiff that he would leave the record open for ten days to allow Plaintiff to submit a RFC assessment performed by Dr. Nguyen (R. 22–23).

### D. Vocational Evidence

Ms. Cathleen Sampeck, an impartial vocational expert, also testified at Plaintiff's administrative hearing (R. 43). The VE characterized Plaintiff's work position as a letter carrier as medium, semiskilled (R. 44). In addition, the VE remarked that in Plaintiff's employment file

it indicated lifting up to seventy pounds, which means it was performed at a heavy exertion level.

Id.

The ALJ then posed the following hypothetical to the VE:

Q: Assume that because of a medically-determinable impairment or combination of impairments the person hypothetical number one has the following capabilities: the individual can frequently lift or carry 10 pounds; can occasionally lift or carry 20 pounds; can sit, stand, or walk six hours in an eight-hour day and constantly push/pull at the light exertional level; the individual can occasionally climb stairs or ramps; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, or crawl; the individual can occasionally be around unprotected heights, moving mechanical parts, humidity and wetness, extreme cold, and vibrations, all occasional—really environmental; the individual would have no other limitations.

(R. 44).

Although the VE answered that such a person would not be able to return to past work based on these characteristics, the VE did testify that certain jobs were available to such a hypothetical person: non-postal mail sorter, router, and a route clerk (R. 45).

The ALJ then asked the VE another hypothetical:

Q: A person of the same age, education, and work experience as the claimant who could frequently lift and carry 10 pounds; could occasionally lift and carry 20 pounds; can sit for six hours in an eight-hour day; could stand or walk for four hours in an eight-hour day; could frequently operate foot controls with the bilateral feet; could occasionally climb stairs or ramps; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, or crawl; the individual could occasionally be around unprotected heights, moving mechanical parts, humidity and wetness, dusts, odors, fumes, pulmonary irritants, extreme cold, vibration; the individual would have no other limitations.

(R. 45–46).

Again, the VE testified that such a person could not perform past work, but would be able to perform work as a mail sorter, router, and an office helper (R. 46). The ALJ then added the following limitation to the above hypothetical: the person must prop their feet up at the normal three breaks in the workday, 15-minute break and use a cane to ambulate only. Id. The VE

answered that a person would still be able to perform the mail sorter and router position; however, there would be a 50% decrease in the number of available office helper positions based on this limitation. Id.

The ALJ then proceeded to ask the VE the last hypothetical:

> Q: Assume that this individual could frequently life and carry less than 10 pounds; could occasionally life and carry 10 pounds. That's different from the other two. Could sit for six hours in an eight-hour day; could stand or walk four hours in an eight-hour day; frequently operate foot controls with the bilateral feet; occasionally climb stairs or ramps; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch or crawl; the individual could occasionally be around unprotected heights, moving mechanical parts, humidly (sic) and wetness, dusts, odors, and pulmonary irritants, cold, and vibrations are all occasional; the individual could understand, remember, and carry out work simple instructions; they have frequent contact with supervisors, coworkers, and the public.

(R. 47–48).

The VE testified that a person could not perform past work, but a person would be able to perform work as an addresser, document scanner, and a charge account clerk (R. 48). The ALJ added the same limitation to the hypothetical as before—cane for ambulation and propping feet up at three normal breaks—and the VE stated that no light jobs would fit that criteria (R. 49). Finally, the ALJ asked the VE whether there would be any available jobs if an individual would be "off task 15% of the time and miss two days of work per month." Id. The VE stated that there would be no jobs available. Id. All of the VE's answers were consistent with the Dictionary of Occupational Titles and Social Security Ruling 00-4p with the exception of the cane and propping up of the feet limitation. Id.

Following this question, Plaintiff cross-examined the VE. Specifically, Plaintiff asked the VE whether the jobs listed under the first two hypotheticals would allow a sit/stand at will opinion. Id. The VE answered that the route clerk and sorting position would not allow it but the

other positions would. Id. Plaintiff then asked about a person propping their feet up, and the VE stated that most work places would accommodate that as long as their feet were only a few inches off the ground (R. 50). VE then continued to testify that the jobs for hypothetical three would allow a person to sit and stand at will and that a person who used cane would not be impacted on their ability to work unless the person had to stand for more than a couple minutes with the cane in their hands (R. 51). This concluded Plaintiff's questioning of the VE.

The ALJ then asked the VE one last question whether the answers to the three hypotheticals would change if the person had to stand every hour for thirty minutes. Id. The VE stated there would be no change based on her previous experience (R. 52). This concluded the VE's testimony.

### E. Report of Contact Forms, Work History Reports & Disability Reports

#### 1. Work History Report

On September 2, 2011, Plaintiff completed a work history report (R. 151–53). In the report, Plaintiff indicated that he had worked as a letter carrier for the U.S. Postal Service from 1991 to 2011 (R. 151). Plaintiff described his everyday duties as putting mail in delivery order and then walking 8.5 miles a day door-to-door delivering mail (R. 152). Plaintiff then stated that the position required him to lift up to 70 pounds of packages and carry a mailbag on his shoulder weighing between 35–40 pounds each day for eight hours. Id.

#### 2. Disability Reports

On August 8, 2011, Plaintiff completed a disability report (R. 132–42). Plaintiff indicated that certain physical and mental conditions impacted his ability to work: (1) five herniated discs in back; (2) back injury; (3) depression; (4) anxiety; (5) high blood pressure; (6) high cholesterol;

(7) acid reflux; (8) degenerative bone disease; and (9) numbness in legs and feet (R. 133). Plaintiff stated that he stopped working on August 1, 2011, because of these conditions. Id.

Plaintiff later submitted two disability report-appeal forms in December and March. On December 20, 2011, Plaintiff reported no change in his condition (R. 158). However, on March 14, 2012, Plaintiff indicated an increased level of pain and feeling more depressed and anxious (R. 175). Plaintiff stated these symptoms approximately occurred on February 1, 2012. Id. Plaintiff reported that personal tasks take longer to finish, he could no longer play with his son, drive or ride in cars, or have sexual relations with his wife (R. 177).

### *3. Report of Contact Forms*

On November 22, 2011, Marinda K. Smarr completed a report of contact form opining that Plaintiff is capable of performing light exertional work with postural restrictions (R. 154). Ms. Smarr classified Plaintiff's last work as a mail carrier as medium exertional work. Id. Although concluding that Plaintiff could not perform his past work, Ms. Smarr found that Plaintiff could perform other work such as a garment folder, glove pairer, and sorter. Id.

On February 10, 2012, Amy Rogers completed a report of contact form opining that Plaintiff is capable of performing light exertional work with environmental restrictions (R. 171). Ms. Rogers classified Plaintiff's work as a mail carrier as medium exertional work. Id. While Ms. Rogers concluded that Plaintiff could not return to his past work, Ms. Rogers did state that Plaintiff could work as a garment folder, glove pairer, and sorter. Id.

### F. Lifestyle Evidence

### *1. First Adult Function Report*

On August 28, 2011, Plaintiff completed his first adult function report (R. 143–50). In the report, Plaintiff stated that he suffers from pain radiating from the herniated discs in his back (R.

143, 150). He described his typical day as helping his son get ready for school, doing small loads of laundry, doing the dishes, sitting or lying down on the couch, taking care of the dog, and helping his son with his homework after school (R. 144). At night, he experiences sleep trouble because he is "unable to get comfortable in bed because of back and leg pain." Id. Plaintiff's daily medications, which include Percocet and a Duragesic patch, make him anxious, forgetful, and drowsy, (R. 150).

In the report, Plaintiff explained how he is physically limited in some areas but not in others. Due to his conditions, Plaintiff indicated he cannot do yard work, deliver mail, carry groceries, or play with his son (R. 144). He can, however, prepare most of his own meals, clean the dishes, and do some laundry (R. 145). He does not drive when he takes medication for his back (R. 146). Plaintiff indicated that he has no problems handling money, paying bills, counting change, or using a checkbook. Id.

While Plaintiff can perform some activities, others prove more difficult. For example, Plaintiff can no longer partake in certain hobbies such as hunting, gardening, or playing sports (R. 147). However, he still is able to go out to dinner with his family, attend church services, and go to local sporting events. Id. In addition, Plaintiff can walk approximately a fourth of a mile before taking a break, although he can resume walking in 15 minutes (R. 148).

Regarding his mental abilities, Plaintiff has no issues following written instructions or following spoken instructions. Id. He handles stress "ok" and handles changes in his routine "fine" (R. 149).

### 2. Second Adult Function Report

A few months later, January 18, 2012, Plaintiff completed another adult function report (R. 163–70). Plaintiff stated that he is still in pain due to the herniated discs in his back coupled

with GERD and high blood pressure (R. 163). A typical day still involves helping his son get ready for school, preparing meals, and napping (R. 164–65). Plaintiff indicated that he still helps take care of the pets but has his son feed and water them now (R. 164). Plaintiff stated that he still experiences sleep trouble because the pain keeps waking him up at night. Id.  He now takes morphine, which makes him drowsy and causes shortness of breath (R. 170).

Plaintiff indicated that he still cannot partake in some activities. He still cannot do any yard work due to the pain (R. 165–66). He did note that he does drive now, but only for short distances when absolutely necessary (R. 166). He rarely hunts and fishes; instead, he mainly watches television and does puzzle books (R. 167). He attends church still regularly however. Id. He cannot walk as far without having to stop; he indicated that he can only walk 100 yards before needing a break (R. 168). He stated that he cannot handle stress well (R. 169). In addition, he now uses a cane for any walking distance. Id.

## III. THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . . '[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2004). The Social Security Administration uses the following five-step sequential evaluation process to determine whether a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the [RFC] of the claimant is evaluated "based on all the relevant medical and other evidence in your case record . . . ."]

(iv) At the fourth step, we consider our assessment of your [RFC] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (2015); 20 C.F.R. § 416.920 (2012). In steps one through four, the burden is on the claimant to prove that he or she is disabled and that, as a result of the disability, he or she is unable to engage in any gainful employment. Richardson v. Califano, 574 F.2d 802, 804 (4th Cir. 1978). Once this is proven, the burden of proof shifts to the Government during step five to demonstrate that jobs exist in the national economy that the claimant is capable of performing. Hicks v. Gardner, 393 F.2d 299, 301 (4th Cir. 1968). If the claimant is determined to be disabled or not disabled at any of the five steps, the process will not proceed to the next step. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

## IV. THE ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2.   The claimant has not engaged in substantial gainful activity since August 1, 2011, the alleged onset date (20 CFR 416.971 *et seq.*).

3.   The claimant has the following severe impairments: degenerative disc disease and hypertension (20 CFR 404.1520(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform less than a full range of light work as defined in 20 CFR 404.1567(b). He can lift/carry 10 pounds frequently and 20 pounds occasionally, sit for 6 hours in an 8-hour workday, and stand/walk for 4 hours in an 8-hour workday. He can frequently operate foot controls with his feet bilaterally. He can occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, and occasionally balance, stoop, kneel, crouch, or crawl. He could have occasional exposure to unprotected heights, dusts, fumes, and other pulmonary irritants, extremes of cold, and vibration.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.   The claimant was born on August 9, 1962 and was 48 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from August 1, 2011, through the date of this decision (20 CFR 404.1520(g)).

## V. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

Plaintiff contends:

1.    The ALJ failed to consider all of Plaintiff's severe impairments in his step three evaluation (Pl.'s Br. at 8–9).

2.    The ALJ committed reversible error in failing to properly evaluate Woodard's depression and resulting functional limitations as required by 20 C.F.R. § 404.1520(a) (Pl.'s Br. at 9–11).

3. The new evidence from Dr. Thomas Nguyen, which was previously submitted to the Appeals Council, warrants changing the ALJ's decision (Pl.'s Br. at 11–13).

The Commissioner contends:

1. Substantial evidence supports the ALJ's step three analysis (Def.'s Br. at 8–9).

2. Substantial evidence supports the ALJ's analysis of Plaintiff's depression (Def.'s Br. at 9–12).

3. Plaintiff failed to demonstrate that evidence submitted for the first time to the Appeals Council required remand (Def.'s Br. at 12–14).

### C. The ALJ Considered All of Plaintiff's Impairments

Plaintiff contends that the ALJ erred by not rendering a complete step three analysis (Pl.'s Br. at 8). Because the ALJ found Plaintiff's hypertension to be a severe impairment at step two, Plaintiff alleges first that the ALJ failed to consider whether Plaintiff's hypertension met or equaled a cardiovascular listing at step three. Id. Plaintiff argues in essence that the "ALJ's failure to thoroughly assess all of [Plaintiff's] recognized severe impairments at step three essentially constituted a skipping a step of the sequential evaluation process . . ." (Pl.'s Br. at 9).

Defendant, on the other hand, argues that Plaintiff's argument is without merit because no evidence in the record exists "supporting a finding that Plaintiff meets even one (much less all) of the requirements for a cardiovascular listing" (Def.'s Br. at 8).

Here, the ALJ concluded that Plaintiff's hypertension was a severe impairment, but that it did not qualify as a listing (R. 13–14). Plaintiff asserts that his hypertension does meet a cardiovascular listing despite, however, never explicitly stating what particular listing he qualifies for (Pl.'s Br. at 8).

The listings under the regulations, located at Appendix 1, Subpart P of Part 404, are "descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect" with each impairment "defined in terms of several

specific medical signs, symptoms, or laboratory test results." <u>Sullivan v. Zebley</u>, 493 U.S. 521, 529–30 (1990). No matter how severe or troublesome Plaintiff's symptoms may be, "to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." <u>Id.</u> at 530 ("An impairment that manifests only some of those criteria, no matter how severely, does not qualify"). This is a high standard to meet but it was purposefully made this way. <u>See id.</u> at 532 ("The Secretary explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard").

A cardiovascular impairment, located in Section Four, is "any disorder that affects the proper functioning of the heart or the circulatory system (that is, arteries, veins, capillaries, and the lymphatic drainage). The disorder can be congenital or acquired." 20 C.F.R. Pt. 404, Subpt. P. App. 1, § 4.00(A)(1). Hypertension, however, is no longer a specific impairment under the cardiovascular listings:

> Because hypertension (high blood pressure) generally causes disability through its effects on other body systems, we will evaluate it by reference to the specific body system(s) affected (heart, brain, kidneys, or eyes) when we consider its effects under the listings. We will also consider any limitations imposed by your hypertension when we assess your residual functional capacity.

<u>Id.</u> at § 4.00(H)(1). The regulations only list eight cardiovascular impairments each with their own distinct criteria: (1) chronic heart failure; (2) ischemic heart disease; (3) recurrent arrhythmias; (4) symptomatic congenital heart disease; (5) heart transplant; (6) aneurysm of aorta or major branches; (7) chronic venous insufficiency; and (8) peripheral arterial disease. <u>See id.</u> at § 4.02–4.12.

No evidence in the record supports a finding that Plaintiff has any one of the above cardiovascular listings. According to the regulations, the two cardiovascular listings that hypertension is associated with is chronic heart failure and ischemic heart disease. <u>See id.</u> at §

4.00(D)(1)(b), 4.00(E)(2)(a). However, Plaintiff fails to meet the chronic heart disease listing because he does not have a medically documented presence of either systolic or diastolic failure. Id. at § 4.02(A)(1–2). In addition, Plaintiff does not qualify for the ischemic heart disease listing because he has never been diagnosed with coronary artery disease; has never had three separate ischemic episodes; or has never had a sign-or-symptom-limited exercise tolerance test with certain manifestations. Id. at § 4.04(A–C).

The ALJ furthermore did not have to conduct, as Plaintiff argues, a full-fledge analysis by comparing Plaintiff's signs, symptoms, and medical findings to the listing criteria. See Cook v. Heckler, 783 F.2d 1168, 1172 (4th Cir. 1986). The Fourth Circuit has held that Cook "does not establish an inflexible rule requiring an exhaustive point-by-point discussion in all cases." Russell v. Chater, No. 94-2371, 1995 WL 417576, at *3 (4th Cir. July 7, 1995). Cook only applies when there is "*ample* evidence in the record to support a determination" that Plaintiff's impairment meets or equals one of the listings. See Cook, 783 F.2d at 1172–73 (emphasis added). Unlike in Cook, where there was sufficient evidence justifying the claimant's impairments, here no evidence exists connecting Plaintiff's hypertension to any cardiovascular listing. There *is*, however, ample evidence [R. 215, 331, 414, 451, 459, 466] noting that Plaintiff's hypertension responded well to medication and was becoming stable again. See Gross v. Heckler, 785 F.2d 1163, 1166 ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling").

Finally, Plaintiff lastly asserts that the ALJ failed to address whether his hypertension in combination with his other impairment, degenerative disc disease, equaled a listing (Pl.'s Br. at 8–9). Defendant states that the ALJ "adequately considered the combined effects of Plaintiff's impairments . . ., made particularized findings on the combination of impairments," and

"discussed Plaintiff's hypertension and corresponding medical records throughout his decision." (Def.'s Br. at 8–9).

According to the Fourth Circuit, "determining whether an individual's impairments are of sufficient severity to prohibit basic wok related activities, an ALJ must consider the combined effects of a claimant's impairments." Reichenbach v. Heckler, 808 F.2d 309, 312 (4th Cir. 1985); see also DeLoatche v. Heckler, 715 F.2d 148, 149 (4th Cir. 1983); Oppenheim v. Finch, 495 F.2 396, 398 (4th Cir. 1974); Hicks v. Gardner, 393 F.2d 299, 302 (4th Cir. 1968). When considering the combined effects of impairments, the ALJ must then "adequately explain his or her evaluation . . . ." Reichenbach, 808 F.2d at 312.

After reviewing the entire record, the undersigned finds that the ALJ did conduct such an evaluation. The ALJ specifically stated that Plaintiff's impairments "cause[d] more than minimal functional limitations, and are considered severe" (R. 13). Further, the ALJ stated that "claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" from the regulations (R. 14). While the undersigned does admit that the ALJ's reasoning in section 4 alone of his opinion [R.14] is underdeveloped, the decision taken as a whole reveals a different conclusion. When calculating Plaintiff's RFC, the ALJ went step-by-step and summarized each of the medical records findings (R. 15–18). In those findings, he discussed the Plaintiff's hypertension and back impairment. Id. Therefore, the undersigned finds that this analysis, taken as a whole, fulfills the "adequate[] . . . evaluation" requirement.

### D. Plaintiff's Depression is Not a Severe Impairment

Plaintiff next contends that the ALJ erred by not finding Plaintiff's depression to be a severe impairment (Pl.'s Br. 9–11). Specifically, Plaintiff argues that the record demonstrated

that his depression did impact his functional ability and that the ALJ failed to provide any explanation or rationale when deciding that depression was not a severe impairment (Pl.'s Br. at 10–11).

Defendant counters this stating that "there was no medical or other basis for the ALJ to find that Plaintiff's depression constituted a severe impairment" (Def.'s Br. at 9). Defendant argues that Plaintiff's depression did not cause minimal limitations in his word activities and thus did not suffer any functional limitations (Def.'s Br. at 9–12).

To determine whether a disability exists, the claimant bears the burden of proving that he or she suffers from a medically determinable impairment that is severe in nature. Farnsworth v. Astrue, 604 F. Supp. 2d 828, 851 (N.D. W. Va. 2009). When proving that he or she suffers from a medically determinable impairment, the claimant must show more than a "mere diagnosis of condition . . . . [I]nstead, there must be a showing of related functional loss." Pierce v. Colvin, No. 5:14CV37, 2015 WL 136651, at *16 (N.D. W. Va. Jan. 9, 2015) (citations omitted).

An impairment is severe when, whether by itself or in combination with other impairments, it significantly limits a claimant's physical or mental abilities to perform basic work activities. 20 C.F.R. § 404.1520(c). Basic work activities are "the abilities and aptitudes necessary to do most jobs," including capacities for seeing, hearing and speaking and physical functions such as walking and standing. 20 C.F.R. § 404.1521(b).

Any impairment must result from abnormalities, which can be shown by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1508. Unless the impairment will result in death, it must have lasted or be expected to last for a continuous period of at least twelve months. 20 C.F.R. § 404.1509. An impairment, however, can be considered "'not severe' only if it is a slight abnormality which has such a minimal effect on the individual

that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984).

If the claimant is alleging a mental impairment, however, the ALJ must forgo the traditional analysis and utilize a "special technique" applying the "paragraph B criteria" under the regulations. 20 C.F.R. § 404.1520a(b); see also 20 C.F.R. Pt. 404, Subpt. P. App. 1., § 12.00(C)(1–4). Four elements comprise these "paragraph B criteria": (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. Pt. 404, Subpt. P. App. 1., § 12.00(C)(1–4). The regulations require the ALJ to document application of the technique, rate the four "paragraph B criteria" using certain labels, and list pertinent findings in support. See 20 C.F.R. § 404.1520a. If the ALJ rates the degree of limitations as "mild" in the first three elements and "none" in the fourth element, then "we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities." 20 C.F.R. § 404.1520a(d)(1).

Activities of daily living "include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. Pt. 404, Subpt. P. App. 1., § 12.00(C)(1). To evaluate a claimant's daily activities, the ALJ will "assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction." Id.

Social functioning "refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals" and also "includes the ability to get

along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers." Id. at § 12.00(C)(2). A claimant "demonstrate[s] impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation"; a claimant can, on the other hand, also "exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities." Id.

Concentration, persistence or pace "refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." Id. at § 12.00(C)(3).

Finally, episodes of decompensation "are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." Id. at § 12.00(C)(4). These episodes can be "demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two)." Id. To determine whether a claimant suffered an episode of decompensation, the ALJ may infer it "from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode." Id.

Here, the ALJ concluded that Plaintiff's "medically determinable mental impairment of an affective disorder and an anxiety disorder does not cause more than minimal limitation in [Plainitff's] ability to perform basic mental work activities and is therefore nonsevere" (R. 13).

Delving into the "paragraph B criteria," the ALJ rated Plaintiff having "mild limitation" in activities of daily living, social functioning, and concentration, persistence or pace (R. 14). The ALJ also noted Plaintiff had never suffered an episode of decompensation either. Id. To provide support for his analysis, the ALJ stated that Plaintiff had:

> depression and anxiety, but reported he was able to function normally when on his medications. He noted that he was able to perform activities of daily living, use a cell phone, watch television, and perform some housework. He noted to a consultative examiner that he would get his son ready for school, help him catch the bus, read the newspaper, do light housework, and watch television.

> Id.

Despite Plaintiff's complaint that the ALJ did not follow the special technique pursuant to the regulations, the undersigned disagrees and finds that the ALJ did follow the correct procedures. In his decision, the ALJ referenced the "special technique," examined each of the four "paragraph B criteria," issued the correct ratings to each one, and included pertinent facts to support his decision (R. 13–14).

Nevertheless, even if the ALJ's analysis on the "paragraph B criteria" were lacking in some aspects, this Court "will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008); see also Keys v. Barnhart, 347 F.3d 990, 994-95 (7th Cir. 2003) ("The doctrine of harmless error . . . is fully applicable to judicial review of administrative decisions"); Ngarurih v. Ashcroft, 371 F.3d 182, 190 n.8 (4th Cir. 2004) ("reversal is not required where the alleged error clearly had no bearing on the procedure used or the substance of the decision reached").

The record supports the ALJ's analysis that Plaintiff's depression was not a severe impairment. Plaintiff's daily activities and concentration, persistence or pace were not severely

limited: Plaintiff continued to do housework, read, watch television, help his son get ready for school, help take care of pets, do small loads of laundry, go on walks, handle money, pay the bills, and easily follow spoken or written instructions (R. 14, 143–50, 164–65). Regarding his social functioning, Plaintiff still was able to attend church weekly, visit with family and friends, and sometimes attend sporting events (R. 34, 147–48, 167–68).

The undersigned therefore concluded that Plaintiff suffered no severe limitation in the "paragraph B criteria" and substantial evidence supports the ALJ's analysis.

### E. New Evidence Submitted Does Not Warrant Remand

Lastly, Plaintiff contends that new evidence Dr. Nguyen submitted after the issuance of the ALJ's decision dated November 2013 warrants "sentence six" remand of the case (Pl.'s Br. at 11–13). Plaintiff claims that the new evidence "has not been considered previously by the ALJ and could reasonably be expected to change the decision, it is new and material, and thus, warrants proper consideration and review" (Pl.'s Br. at 13).

Conversely, Defendant argues that remand is not necessary because "none of the points Dr. Nguyen makes in his November 2013 statement would change the outcome here" (Def.'s Br. at 13). Specifically, Defendant states that the ALJ already considered Dr. Nguyen's previous opinion; the new opinion is less restrictive than the old one; the State agency physicians opined that Plaintiff has no manipulative limitations; and finally the ALJ only gave Dr. Nguyen's previous opinion little weight (Def.'s Br. at 14).

For social security appeals, there are two types of remand: (1) "sentence four" and (2) "sentence six." See 42 U.S.C. § 405(g). "Sentence four" remand provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without

remanding the cause for a rehearing." Id. "Sentence six" remand, on the other hand, involves the

court remanding a case without making a final judgment:

> The court may . . . remand the case to the Commissioner of Social Security for further action by the Commissioner of Social Security, and it may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the Commissioner of Social Security shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and, in any case in which the Commissioner has not made a decision fully favorable to the individual, a transcript of the additional record and testimony upon which the Commissioner's action in modifying or affirming was based.

Id.

For Plaintiff to therefore qualify under "sentence six" remand, four prerequisites must be

fulfilled:

> [1] The evidence must be "relevant to the determination of disability at the time the application was first filed and not merely cumulative." [2] It must be material to the extent that the Secretary's decision "might reasonably have been different" had the new evidence been before her. [3] There must be good cause for the claimant's failure to submit the evidence when the claim was before the Secretary, and [4] the claimant must present to the remanding court "at least a general showing of the nature" of the new evidence.

Borders v. Heckler, 777 F.2d 954, 955 (4th Cir. 1985) (internal citations omitted).[1]

---

[1] While the court in Wilkins v. Sec'y, Dep't of Health & Human Servs., 953 F.2d 93 (4th Cir. 1991) suggested that the Borders four prong test has been superseded by 42 U.S.C. § 405(g), the Fourth Circuit and this district has continued to cite Borders as authority when presented with a claim for remand based on new evidence. See Hagerman v. Barnhart, No. 03–2355, 2004 WL 887323, at *1 (4th Cir. Apr. 27, 2004); Miller v. Barnhart, No. 02–2394, 2003 WL 1908920, at *4 (4th Cir. Apr. 22, 2003); Wajler v. Colvin, No. 1:13cv156, 2014 WL 4681759, at *10 (N.D. W. Va. Sept. 19, 2014); Lynch v. Astrue, No. 1:10cv210, 2011 WL 764011, at *11 (N.D. W. Va. Oct. 31, 2011); Sandy v. Astrue, No. 1:08cv120, 2009 WL 2006883, at *20 (N.D. W. Va. July 9, 2009); Shifflett v. Astrue, No. 1:08cv136, 2009 WL 1752158, at *3 (N.D. W. Va. June 17, 2009). The Southern District of West Virginia follows this logic as well. See Brock v. Sec'y of Health & Human Servs., 807 F.Supp. 1248, 1250 n. 3 (S.D. W. Va. 1992); Hager v. Astrue, No.

Following the issuance of the ALJ's decision, Plaintiff submitted Dr. Nguyen's November medical opinion to the Appeals Council (R. 5). The opinion stated that Plaintiff could (1) occasionally lift and/or carry 25 pounds; (2) frequently lift and/or carry 15 pounds; (3) stand/walk between four and six hours in an eight-hour workday; and (4) sit six hours in an eight-hour workday (R. 482–83). Additionally, Dr. Nguyen opined that Plaintiff could frequently balance but only occasionally climb, stoop, crouch, kneel, and crawl (R. 483). Concerning environmental restrictions, Dr. Nguyen indicated that Plaintiff had restrictions regarding heights, extreme temperatures, and vibrations. Id. Finally, Dr. Nguyen noted that Plaintiff was limited to occasional reaching and handling but had no visual or communicative limitations (R. 484–85).

On November 5, 2014, the Appeals Council denied Plaintiff's request for review stating that it "considered the reasons you disagree with the [ALJ's] decision and the additional evidence" and found "no reason" to review the ALJ's decision (R. 1–2). Utilizing the four prong test from Borders, the undersigned agrees with the Appeals Council and hereby finds that Plaintiff has not satisfied the criteria needed for remand.

Elements three and four of the Borders test—good cause and general showing—are easily met here and require no in-depth discussion. Plaintiff had "good cause" for failing to submit Dr. Nguyen's opinion to the ALJ because the opinion was rendered approximately six weeks after the ALJ issued his decision and therefore was not in existence in time for the ALJ to evaluate (R. 482–85). In addition, Plaintiff fulfilled the "general showing" requirement when he submitted to the Appeals Council a copy of Dr. Nguyen's opinion; the Appeals Council subsequently then incorporated the opinion into the record and put it on the exhibit list (R. 5).

---

2:09cv01357, 2011 WL 1299509, at *2–5 (S.D. W. Va. Mar. 31, 2011); Bolin v. Astrue, No. 2:09cv00117, 2010 WL 1176560, at * 18 (S.D. W. Va. Mar. 23, 2010).

Dr. Nguyen's opinion however, despite fulfilling elements three and four, does not warrant remand of this case because Dr. Nguyen's findings would not have changed the ALJ's outcome. Plaintiff states that Dr. Nguyen's opinion contains evidence "not available elsewhere in the record" (Pl.'s Br. at 12). Yet, both Dr. Boukhemis and Dr. Lo opined consistent, and in some places, stricter limitations than what Dr. Nguyen concluded (R. 222–29, 311–18). Additionally, Plaintiff states that the "ALJ did not consider the effects of these limitations on [Plaintiff's] residual functional capacity or his ability to sustain work-related activities" (Pl.'s Br. at 13). Again, however, the ALJ in his residual functional capacity analysis crafted limitations that were consistent and in some aspects even more restrictive than what Dr. Nguyen opined in his medical opinion (R. 15). Finally, the ALJ already noted that Dr. Nguyen's previous opinion—which, like his November 2013 opinion, commented on Plaintiff's physical limitations—was entitled "little" weight because it was deemed inconsistent with treatment, findings, and reported activities (R. 17, 380–81). Thus, the undersigned concludes that even if Dr. Nguyen's November 2013 opinion was before the ALJ, it still would not have changed the outcome in this case; Plaintiff hence fails the Borders four prong test.

Furthermore, Plaintiff mentions in passing that the "Appeal Council made no mention of the new evidence submitted for consideration in its subsequent denial beyond providing boilerplate language . . ." (Pl.'s Br. at 13). However, the Appeals Council, when considering new evidence on appeal, is not required to articulate any findings as to why the new evidence did not require reversal of the ALJ's decision. See Meyer v. Astrue, 662 F.3d 700, 706 (4th Cir. 2011). This circuit along with other sister circuits has held that "the regulations do not require the Appeals Council to articulate its rationale for denying a request for review. Only if the Appeals Council grants a request for review and issues its own decision on the merits is the Appeals

Council required to make findings of fact and explain its reasoning." Id. at 706; see also Martinez v. Barnhart, 444 F.3d 1201, 1207–08 (10th Cir. 2006) (finding "nothing in the statutes or regulations" requires the Appeals Council to articulate its reasoning when "new evidence is submitted and the Appeals Council denies review"); Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992) (rejecting contention that Appeals Council must "make its own finding" and "articulate its own assessment" as to new evidence when denying review); Damato v. Sullivan, 945 F.2d 982, 988–89 (7th Cir. 1992) (holding that "the Appeals Council may deny review without articulating its reasoning" even when new and material evidence is submitted to it).

Therefore, upon reviewing the record, the undersigned finds that Dr. Nguyen's opinion does not warrant remand of this case because the Borders factors have not all been fulfilled.

## VI. RECOMMENDED DECISION

For the reasons herein stated, I accordingly recommend Defendant's Motion for Summary Judgment be **GRANTED,** and the Plaintiff's Motion for Summary Judgment be **DENIED** and this matter be dismissed and struck from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to provide an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 10th day of December, 2015.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE